## APPEAL OF THE CORNWALL & LEBANON R. CO.

### [CORNWALL R. CO. v. CORNWALL & LEBANON R. CO.]

FROM THE DECREE OF THE COURT OF COMMON PLEAS OF LEBANON COUNTY, IN EQUITY.

Argued February 21, 1889—Decided April 8, 1889.

[To be reported.]

(a) Two railroad companies executed an agreement providing: " In the use or working of the railroads of the parties hereto at or near the point of crossing, all trains, engines, or cars of the party of the second part, shall come to a full stop at a distance of at least two hundred feet from the point of crossing, and shall not proceed until the proper signal shall have been given by the watchman in charge. All the engines and trains of the party of the first part, shall have priority of passage over the trains and engines of the party of the second part, but no unnecessary detention shall be caused to the trains of either of the parties, nor shall said crossing be blocked by either party."

(b) The company of the first part filed a bill in equity against the other company to enforce the terms of the agreement. The master found that the defendant had been stopping its trains about 800 feet from the crossing, and that, owing to a bluff, and steep grade, at the crossing, it was dangerous not to stop nearer to it; and that the defendant had refused to give priority of passage to plaintiff's trains except those of the same class.

(c) The master, therefore, recommended a decree that all of defendant's trains be ordered to stop between two and three hundred feet from the crossing, and that plaintiff's trains were entitled to priority of passage without regard to class : the court entered a decree in accordance with this report, and imposed the costs on the defendant. *Held*, affirming this decree :

Statement of Facts.

1. That the language that "all trains and engines" of the plaintiff should have priority over those of the defendant, was unambiguous and made no distinction of trains and engines into classes, and that there was no warrant to go outside of the agreement to ascertain the rules of priority given to the various classes of trains and apply them to the agreement.
2. That the agreement and the facts found by the master, warranted the decree that defendant's trains must stop between two and three hundred feet from the crossing; that equity had jurisdiction to enforce such contracts, that the facts showed this to be a proper case for equitable intervention, and that the disposition of costs was correct.

Before PAXSON, C. J., GREEN, CLARK, WILLIAMS and McCOLLUM, JJ.

No. 297 January Term 1888, Sup. Ct.; court below, No. 1, Equity D., 1887, C. P. in Equity.

A bill in equity filed by the Cornwall Railroad Company against the Cornwall & Lebanon Railroad Company, to enforce the terms of a certain written agreement between said companies, averred, in substance, as follows:

That the defendant has carried its railroad across the railroad of the plaintiff, at grade, at Cornwall; that the plaintiff and defendant, by agreement in writing, dated December 4, 1886, agreed inter alia:

"Fourth. In the use or working of the railroads of the parties hereto at or near the point of crossing, all trains, engines, or cars of the party of the second part shall come to a full stop at a distance of at least two hundred feet from the point of crossing, and shall not proceed until the proper signal shall have been given by the watchman in charge.

"All engines and trains of the party of the first part shall have priority of passage over the trains and engines of the party of the second part; but no unnecessary detention shall be caused to the trains of either of the parties hereto, nor shall said crossing be blocked by either of the said parties."

That the defendant in the use or working of its railroad, at or near the crossing, did, for a short period, in accordance with the terms of said agreement, bring all its trains and engines to a full stop, two hundred feet from the point of crossing, and gave to all the trains of the plaintiff priority of passage over all its trains and engines, but the defendant, on May 13, 1887, "and on divers days before and since that day, did and does

now carry its trains and engines across said crossing without bringing them to a full stop when approaching the same, as required by said agreement, and now has ordered its employees to give priority of passage only to such trains and engines of the plaintiff, as are of the same class, as the trains and engines of the defendant, approaching the crossing; and further, that the defendant, contrary to its agreement, on, to wit: the 13th day of May, 1887, and on divers days since, did carry certain of its south-bound trains over the crossing without bringing them to full stop, except at its station at Cornwall, a distance of at least eight hundred and fifty feet from the point of crossing, and did carry certain other of its south-bound trains over the crossing without bringing them to full stop within a distance of four hundred feet from the same, and on, to wit: the 13th day of May, 1887, and on divers days since, did carry its north-bound trains over the crossing without bringing them to a full stop within four hundred feet from the same. That such violation, by the defendant, of the above terms of the agreement, in the use or working of its railroad, at or near the crossing, if continued, will greatly endanger life and may occasion serious damage to property."

The complainant prayed the court, that the defendant may be enjoined from violating the terms of its agreement.

The answer of the Cornwall & Lebanon Railroad Company was substantially as follows: The defendant admits the truth of the facts averred in the first and second paragraphs of the plaintiff's bill, and also further that on December 4, 1886, "the defendant did enter into an agreement with the plaintiff, as alleged, but denies that at any time it brought all its trains and engines to a full stop two hundred feet from the point of the crossing, but that all of its trains and engines come to a full stop at a point about three hundred and sixty feet south of the crossing, and at its station, about eight hundred feet north of the crossing; that said crossing is guarded by two watchmen, one on each side; that after its trains and engines stop as aforesaid, they do not proceed until the proper signal is given by the watchmen at the crossing; that the watchmen do not signal the trains or engines of the defendant, if any train or engine of the plaintiff is approaching in dangerous proximity; that after getting the signal from the watchmen to proceed,

the trains and engines of the defendant are run towards the crossing under full control; that to come to a full stop after leaving the points designated, if no train on the plaintiff's road is in dangerous proximity, would be unnecessary and would be very expensive and inconvenient to the defendant. The defendant denies the right of the plaintiff to priority of passage of all its trains and engines over the trains and engines of the defendant, but admits that under the agreement plaintiff's trains are entitled to priority over defendant's trains of the same class."

Issue having been joined, *Mr. A. W. Ehrgood* was appointed examiner and master and filed the following report:

From the testimony admitted, your master finds the following facts: That the Cornwall Railroad Company is a corporation duly organized and existing under the laws of Pennsylvania; that the Cornwall & Lebanon Railroad Company has carried its railroad across the railroad of the Cornwall Railroad Company, at grade, at Cornwall, in the county of Lebanon, and state of Pennsylvania; that the plaintiff and defendant on December 4, 1886, entered into a written agreement under their respective corporate seals, an exact copy of which is hereto attached and made a part of this report, in which they agreed, among other things as to the mode and manner of the operation of the crossing aforesaid; that said crossing is at a sharp curve of the Cornwall Railroad, east or northeast of which is a high bluff, obstructing the view of engineers coming on said railroad from the south, from trains and engines coming on either railroad from the north, until the trains or engines are very near the crossing, so that the safety of the operation of the crossing in that respect depends almost entirely upon the reliability and cautiousness of the watchman or watchmen placed there to guard and protect trains and engines approaching the same; that both the railroads of the plaintiff and the defendant approach said crossing from the south on heavy grades, and the Cornwall Railroad approaches said crossing from the south and north in a curve above the average curvature as generally found in railroads; that the tracks of the Cornwall & Lebanon Railroad cross the tracks of the Cornwall Railroad in an almost straight line. All the elements of

danger, at this crossing, combined, make it a dangerous crossing, and one requiring more than ordinary care in its operation, caution on the part of all the employees of both corporations.

Your master further finds that the passenger trains of the Cornwall & Lebanon Railroad Company, since the making of the agreement and prior to May 7, 1887, in approaching said crossing from the north, made their last stop before coming to the crossing at Cornwall station, about nine hundred feet north of the crossing; that the north-bound passenger trains of the Cornwall & Lebanon Railroad Company came to a full stop at Bird Coleman station, when they had passengers to get on or off; some of the south-bound freight trains of the Cornwall & Lebanon Railroad Company, came to a full stop at their freight depot, north of their Cornwall station, before approaching the crossing, and some did not stop at all; that north-bound freight trains sometimes came to a full stop at Bird Coleman station, before approaching the crossing; that from May 7, 1887, to May 13, 1887, all trains and engines of the Cornwall & Lebanon Railroad Company, in approaching the crossing, came to a full stop at points about three hundred feet on either side of the crossing, and gave priority of passage to all trains and engines of the Cornwall Railroad Company; that all passenger trains of the Cornwall & Lebanon Railroad Company, between May 13, 1887, and May 23, 1887, in approaching the crossing from the north, came to a full stop at their Cornwall station, about nine hundred feet north of the crossing; that all freight trains of the Cornwall & Lebanon Railroad Company, during said period, in approaching said crossing from the north, came to a full stop, at said station or at the public road crossing, just south of it; that all trains and engines of the Cornwall & Lebanon Railroad Company, during said period, in approaching said crossing from the south, came to a full stop at the bridge about three hundred and sixty feet south of the crossing, and gave priority of passage only to trains and engines of the same class of the Cornwall Railroad Company, and even trains of the same class were not always awarded priority of passage over the trains of the Cornwall & Lebanon Railroad Company.

This brings us to the consideration of the agreement entered into between the parties.

Master's Report.

In the construction of the agreement, or of the clauses brought into contention in this case, the plaintiff contends that the clause relating to the bringing of all trains to a full stop, at least two hundred feet from the crossing, means near two hundred feet from the crossing; and that the clause relating to priority of passage means priority of passage to all trains and engines, without reference to class. The defendant contends that the stopping of its passenger trains and some freight trains at the Cornwall station, and the other freight trains just south of their station, at the public road crossing, and giving priority of passage by passenger trains over passenger trains, and freight trains over freight trains, is in conformity with the spirit of the agreement, if not with the letter; and that an additional stop between their station and the crossing would greatly inconvenience and delay the Cornwall & Lebanon Railroad trains, and giving priority of passage to all trains of the Cornwall Railroad would greatly interfere with their business. On the other hand, the plaintiff contends that the present operation of the crossing by the Cornwall & Lebanon Railroad Company interferes with their business.

The language of the agreement, viz.: " In the use or working of the railroads of the parties hereto, at or near the point of crossing, all trains, engines or cars of the party of the second part shall come to a full stop, at a distance of at least two hundred feet from the point of crossing, and shall not proceed until the proper signal shall have been given by the watchman in charge." This language is unambiguous and unequivocal, and from an examination of one of the authorities cited by the solicitor for the plaintiff, North. Cent. Ry. Co.'s App., 103 Pa. 621, your master finds a decree of the court relative to a railroad crossing, at grade, in almost the exact language of the agreement entered into between the plaintiff and defendant in this case. And your master is of the opinion that the agreement so entered into is as binding as a decree of court would be, had these contending parties invoked the aid of the court to decree how or in what manner this crossing should be operated, and the province of the court now is, the construction of the agreement.

In the construction of that clause of the agreement as to the stoppage of all trains, in which the words " at least two hun-

dred feet," etc., occur, your master is of the opinion that it means that all trains must come to a full stop, at about two hundred feet from the crossing, and not nearer, and that a stop eight hundred or nine hundred feet away is not in conformity with the letter or the spirit of the agreement. The Cornwall & Lebanon Railroad Company have to some extent, between May 7, 1887, and May 13, 1887, placed a construction upon the clause of the agreement now in dispute, viz. : That all south-bound trains must come to a full stop at a distance of about three hundred feet north of the crossing, and all north-bound trains must come to a full stop at a distance of about three hundred feet south of the crossing. Such a construction is as near in conformity with the agreement, as should under all the circumstances be enforced. As to the priority of passage your master concludes that the spirit as well as the letter of the agreement contemplates priority of passage to all Cornwall Railroad trains over all trains of the Cornwall & Lebanon Railroad, without regard to class.

The master recommended a decree accordingly. Exceptions to his report were dismissed by the court, in the following opinion by McPherson, J. :

Under the act of June 19, 1871, P. L. 1361, courts of equity are required to decide whether one railroad shall be allowed to cross another at grade. If such crossing is permitted, it is in most cases a necessary incident of the decision that the court should also lay down the rules to govern its use, as was done in the proceeding reported in North. Cent. Ry. Co.'s App., 103 Pa. 623. In the case before us, the parties themselves have done both these things by agreement; they have allowed a crossing at grade, and they have adopted a set of rules for its use.

The defendant, however, finds it burdensome to observe strictly all the terms of its contract, and in effect asks us to revise it in two particulars :

1. By giving priority of passage to its passenger trains over the freight trains of the plaintiff, although the agreement provides that " all engines and trains of the (plaintiff) shall have priority of passage over the trains and engines of the (defendant) ; " and

2. By practically striking out that part of clause four which reads as follows : " In the use or working of the railroads of the parties hereto at or near the point of crossing, all trains, engines or cars of the (defendant) shall come to a full stop at a distance of at least two hundred feet from the point of crossing, and shall not proceed until the proper signal shall have been given by the watchman in charge."

In our opinion we have no authority to make either change. Both provisions tend to promote the safe carriage of persons and property over the crossing in question ; no danger to the public is threatened by the enforcement of either ; and, since no ground to justify our interference with the contract has been shown, the defendant must be held to its voluntary agreement, although its obligation may now be found inconvenient and may not be such as the court would have thought it necessary to impose. For this reason, many of the authorities cited by the defendant as to the considerations which sometimes influence a chancellor to refuse an injunction, as, for example, the greater inconvenience of the decree to the party sought to be enjoined, do not now apply; and that portion of the testimony which refers to the custom of railroads, the probable inconvenience to the defendant of keeping its agreement, the safety and use of crossings elsewhere, and the safety of the present method of using this crossing, is not relevant. We agree with the master's construction of the disputed clause, and must prevent the defendant from operating its road in violation thereof.

It has been suggested that this bill cannot be sustained because no harm has yet been done, but this does not seem to need much discussion. The provisions which are being disregarded by the defendant are intended to prevent the doing of harm, and the public interest in the safety of the crossing is alone sufficient to require us to exercise jurisdiction. As was said in Brush Electric Co.'s App., 114 Pa. 585, " Equitable jurisdiction does not depend on the want of a common law remedy; for, while there may be such a remedy it may be inadequate to meet all the requirements of a given case, or to effect complete justice between the contending parties ; hence, the exercise of chancery powers must often depend on the sound discretion of the court. A bill may be sustained solely on the ground that it is the most convenient remedy."

Neither is it now material to inquire whether the plaintiff has vexatiously used the crossing, either before or since the filing of the bill. Under the pleadings no decree against the plaintiff on this account could be made in this proceeding, and we do not think the doctrine of "clean hands" can be strictly applied where the safety of the public is itself a sufficient ground for action by the court.

We therefore dismiss the exceptions and direct the following decree to be entered:

1. The Cornwall & Lebanon Railroad Company, its officers, agents and workmen, are hereby enjoined from using the grade crossing over the Cornwall Railroad, at Cornwall, Pennsylvania, in any other than the following manner:

All trains and engines of the plaintiff are to be given priority of passage over all trains and engines of the defendant, without regard to class. All south-bound trains of the defendant are to come to a full stop between two hundred and three hundred feet north of said crossing, and all its north-bound trains are to come to a full stop between two hundred and three hundred feet south of said crossing, and in neither case to proceed to cross without first receiving the proper signal from the watchman on duty at said crossing.

2. The costs of this proceeding to be paid by the defendant.

The defendant thereupon took this appeal assigning for error the decree of the court.

*Mr. John G. Johnson* (with him *Mr. Grant Weidman*), for the appellant.

1. The agreement was intended only to give the right of way to trains of like class. The point conceded by the agreement was "priority of passage." What is priority of passage? In the absence of an agreement, the defendants had a right of passage equal to that of the plaintiffs. Their passenger trains had an equal right of passage with those of the plaintiffs. Their freight trains had an equal right of passage with those of the plaintiffs. They relinquished this right. Did they do more? According to the custom of railroads, in the absence of an agreement, passenger trains would have had precedence over the freight trains of the plaintiffs. Did they abandon this? We contend that

they dealt with the question of right of passage where the same was disputable by parties having equal rights, and that they dealt with nothing else. The words "priority of passage" are technical ones, and can only be construed by regarding the interpretation put upon them by other railroad companies.

2. The words of the agreement were that the defendants' trains should be stopped "at least" two hundred feet from the crossing. Under the construction given by this court to the words "at least" in an agreement, it was error to decree that their trains must be stopped at a greater distance than two hundred feet: Roberts v. Wilcox, 8 W. & S. 470. There was no proof of danger to the public by the operation of the defendants' trains, and the well-known principles of equity which refuse an injunction to those who are in default, or who prove no real injury, or where, in remedying a trivial wrong will work irreparable harm to others, are applicable: Clark's App., 62 Pa. 450; Hilliard on Injunctions, § 39; Gray v. The Ohio & Penn. R. Co., 1 Gr. 412; Richards's App., 57 Pa. 105; Harkinson's App., 78 Pa. 203. Costs will not be given where there have been faults on both sides: McMurray v. Davis, 1 W. N. 142.

*Mr Howard C. Shirk* and *Mr. Wayne MacVeagh*, for the appellee:

1. The phrase "all engines and trains of the party of the first part shall have priority of passage over the trains and engines of the party of the second part," must mean that every engine and train of whatever description of the Cornwall & Lebanon Railroad Company must give way to every train of whatever description of the Cornwall Railroad Company. The words "priority of passage" are not technical, as argued by the defendant. They are plain and unambiguous words, and the evidence of experts as to the interpretation put upon them by some other railroad company would not only be valueless, but would be wholly confusing.

2. It is contended that no case was exhibited by the plaintiff which required equitable interference. The answer to this proposition is given by this court in North. Cent. R. Co.'s App., 103 Pa. 621: "The constitution of Pennsylvania does not change the policy of this state, as embodied in the act of June 19, 1871,

to prevent railroad crossings at grade where that is reasonably practicable. That act gives courts of equity jurisdiction in relation to railroad crossings, and requires them to ascertain and define by their decree the mode of such crossing which will inflict the least practicable injury on the rights of the company, the road of which is intended to be crossed; and, if in their judgment, it is reasonably practicable to avoid a grade crossing, they shall by their process prevent a crossing at grade." The jurisdiction of a court of equity is here very clearly laid down. And see Pittsb. etc. R. Co. v. Railway Co., 77 Pa. 173.

3. Courts of equity have the powers of a court of chancery for the prevention or restraint of the commission or continuance of acts contrary to law, and prejudicial to the interests of the community, or the rights of individuals: Act of June 16, 1836, § 13 P. L. 789; Scheetz's App., 35 Pa. 88; Bitting's App., 105 Pa. 517. An action of covenant is rarely regarded as such a remedy as will oust equitable jurisdiction over a bill for specific performance: Brush Electric Co.'s App., 114 Pa. 574, 585; Bierbower's App., 107 Pa. 14; Bispham's Eq., 484; Earley's App., 121 Pa. 496.

OPINION, MR. JUSTICE GREEN:

The litigant parties to this contention undertook, wisely, to settle the terms upon which the crossing of their tracks should be conducted, by an agreement which seems to us to be extremely sensible, plain, and simple. The only controversy that has arisen is upon the practical meaning of the fourth clause of the contract. It is in these words:

"Fourth, In the use or working of the railroads of the parties hereto at or near the point of crossing, all trains, engines, or cars of the party of the second part shall come to a full stop at a distance of at least two hundred feet from the point of crossing, and shall not proceed until the proper signal shall have been given by the watchman in charge. All engines and trains of the party of the first part shall have priority of passage over the trains and engines of the party of the second part; but no unnecessary detention shall be caused to the trains of either of the parties hereto, nor shall said crossing be blocked by either of the said parties."

The appellant contends that the agreement gave the right of

way to the trains of the appellee over those of the appellant only when they were of the same class.    After a most attentive consideration of the appellant's argument in support of this proposition we find that we cannot read the agreement in that way.    The words are, " all engines and trains of the party of the first part shall have priority of passage over the trains and engines of the party of the second part."    There is no ambiguity in this language.    Priority of passage is given to *all* engines and trains of the first party over the trains and engines of the second party.    The words are entirely generic and make no distinction of trains and engines into classes.    It would be necessary to go outside of the agreement and ascertain by parol testimony the fact that there are different classes of trains, such as passenger, freight, gravel, and construction or what other trains, and then to go still further and ascertain, also by parol, which of these were subject to the priority of any and which others, if the appellant's contention is sustained.    But what warrant is there for this?    The helping of ambiguity or the application of an uncertain description to a subject matter are recognized occasions for such resort, but here there is neither.

The trains and engines of the first party are awarded priority, not because they are of a certain class, but because, and only because, they *are* the trains and engines of the first party ; and the " trains and engines " of the second party are expressly subjected to this priority, without even a hint that there is to be any kind of classification of either.    Of course, we can well understand that there might be very good reasons for limiting the exercise of the right to trains and engines of similar classes as against each other, but the difficulty is, the agreement not only does not say so, but it does not contain features which authorize the courts to give it such interpretation.    If the parties had so intended it would have been very easy, indeed, for them to say so.    The fact that they have not done this, is satisfactory evidence that they did not so intend.

The appellant further argues that a full stop at any point more than two hundred feet from the crossing was sufficient, provided it was made at one sufficiently near the crossing to permit the watchman to give the proper signals.    As an abstract proposition this is doubtless true, but its purpose is to defeat the ruling of the master and court below, which directed that

full stops be made by all approaching trains between two hundred and three hundred feet both north and south of the crossing. There is, of course, no legal necessity, from the mere language of the agreement, requiring the farthest limit to be fixed at three hundred feet from the crossing. The master so fixed it, partly because the appellant had, from May 7 to May 13, 1887, stopped all its trains at a distance of about three hundred feet from the crossing on both the north and south sides, and partly because his interpretation of the agreement was that it meant that the stops should be at least two hundred feet from the crossing, and not far away from that as the outside limit. He found as a fact that the appellant stopped their south-bound trains at a distance of eight hundred to nine hundred feet on the north side of the crossing, and he held that this was too far off, and was not in accordance with either the letter or spirit of the agreement. He found that the crossing was a dangerous one on account of the manner in which the appellant's track crossed the appellee's track, and the conformation of the ground, being a high bluff, east or northeast of the crossing, which obstructed the view of engineers coming from the south from trains and engines coming from the north, until the trains and engines are very near the crossing. He also found that the railroads of both parties approach the crossing from the south on heavy grades, and the Cornwall road approaches the crossing from the south and north in a curve above the average curvature as generally found in railroads. He also finds that the safety of the operation of the crossing depends almost entirely upon the reliability and cautiousness of the watchman placed there to protect and guard approaching trains and engines. Influenced by these considerations and by the further thought that a far-off stoppage would be less conducive to safety than one nearer by, he fixed the place of stoppage at any point between two hundred and three hundred feet distant from the crossing on both sides. If there were anything arbitrary and unreasonable in thus fixing the maximum distance at three hundred feet, or if it were made clear to us that such a maximum works oppressively upon the appellant, and that a moderate enlargement of the distance, say to four hundred feet, would relieve the appellant from the hardships and would not increase the danger to the public, we would cheerfully direct such increase in the maximum distance.

But the case of the appellant, as we understand it, is presented to us on the proposition that their trains on the north regularly stop at a station which is some eight hundred or nine hundred feet distant, and the appellant considers that distance sufficiently near to avoid the necessity of another stoppage. The master, however, has found differently on this subject, and we are not convinced that he is in error in that regard. On the contrary his reasons for fixing a nearer point as the maximum distance seem to us quite convincing in favor of his conclusion. He had far better opportunities for determining this than are possible to us, and we do not feel justified in changing the distance as fixed by him. There is no question of law involved in this matter. It is only a question of a sound discretion, regard being had to the public safety on the one hand, and the convenience of the crossing road on the other.

Counsel have not discussed this case on its facts, and we would therefore be justified in holding that the conclusions of fact reported by the master have not been impeached, and must for that reason be sustained, especially as they have been affirmed by the court. But the writer has looked into the testimony for his own satisfaction, and finds that the master's conclusions of fact are sustained by abundant testimony. Witnesses were examined who testified to a number of occasions when disastrous collisions at the crossing were narrowly escaped. Full explanations were given by intelligent witnesses of their reasons for pronouncing the crossing a dangerous one, and describing the precautions that ought to be taken to make it reasonably safe.

As to the jurisdiction of equity in cases like this it cannot be doubted. It has been conferred by statute and most fully recognized and affirmed by the decisions of this court. North. Cent. Ry. Co.'s Appeal, 103 Pa. 621; Pittsb. etc. R. Co. v. Railway Co., 77 Pa. 173. Upon the facts found by the master and affirmed by the court, a sufficient case was made out for equitable intervention. The enforcement of such a contract as the one made between these parties can only be secured by means of a decree in equity. An action at law for breach of its terms would be of no avail. It would not be possible to represent the consequences of a breach by money damages, and a literal performance of its stipulations is essential not only in

the interests of the contracting parties, but also in the interests of the traveling public.

We know of no reason for interfering with the disposition of the costs as made by the court below.

> Decree affirmed, and appeal dismissed at the cost of the appellant.